CHARLES E. STANTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stanton v. Commissioner
Docket No. 5795-77.
United States Tax Court
T.C. Memo 1980-300; 1980 Tax Ct. Memo LEXIS 287; 40 T.C.M. (CCH) 885; T.C.M. (RIA) 80300; August 6, 1980, Filed *287 Held: Fair market value of land determined. Joseph M. Montano, for the petitioner. John D. Moats, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Year
Deficiency
1973
$ 98,221
1974
104,567
1975
124,146
These deficiencies result from the disallowance of carryovers of charitable deductions from a contribution made in 1970. The only issue with which we are presented is the determination of the fair market value of land contributed by petitioner to the Catholic Archdiocess of Denver. FINDINGS OF FACT Some *288 of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner filed his Federal income tax returns for the years in issue with the Office of Internal Revenue Service at Ogden, Utah. At the time he filed his petition herein, petitioner resided in Denver, Colorado. In 1962, petitioner acquired 138 acres of land known as the Belmar property from his wife's estate, including the Belmar Estate (hereafter Estate), a plot consisting of a mansion on a parcel of 9.995 acres of heavily treed land. The Estate has a frontage of 376 feet on Wadsworth Boulevard and a depth of 1,055 feet to the rear or west property line, which is 476 feet. There is a "jog" to the north and south of 50 feet, making the site somewhat irregular. The property is level and at grade level with South Wadsworth Boulevard. The rear property line extends along the boundary of Kountze Lake, providing a view west to the Rocky Mountains. As of May 1, 1970, the property was zoned A-1 [1] agricultural. There was no sewer service to the property at that time and the property was served by a septic system. *289 The Estate is located in the south-central portion of the City of Lakewood in Jefferson County, one of the fastest growing of the five Denver metropolitan counties. It is approximately 6 miles southwest of Denver's downtown business district and is located on the west side of South Wadsworth Boulevard, approximately three blocks south of West Colfax Avenue. In 1970, the downtown district of Lakewood was located near the intersection of Wadsworth Boulevard and West Colfax Avenue. Access to the property is excellent and primarily provided by South Wadsworth Boulevard, which in 1970 was a four-lane, heavily-traveled road running north-south. At the time the Estate was purchased by Lake Craddock Development Company in April 1971, however, it was difficult to get onto the property when going north on Wadsworth Boulevard because there was not a stop light. A stop light was later placed on the street. Also providing access to the neighborhood is Alameda Avenue, located approximately three blocks north of the property. This, too, was a main, heavily-traveled, four-lane artery running in an east-west direction. Both sides of west Alameda Avenue were improved with a mixture of commercial *290 and residential properties U.S. Highway 6 (also Sixth Avenue) is located approximately 10 blocks north of the property. This is a limited access freeway, running in an east-west direction, carrying traffic west to the mountains and east into the downtown business district of Denver. U.S. Highway 6 connects with Interstate Highway 25 near Highway 70 approximately 8 miles west of the property. A large vacant tract was located directly east across Wadsworth Boulevard from the Estate and adjacent to the Villa Italia shopping center to the south. The neighborhood of the property was approximately two-thirds to three-fourths developed in 1970 and the trend in the area was towards further growth. The lands surrounding the property (that is, on the north and south and directly across Wadsworth to the east) well all zoned A-1 in 1970. Nearby property had been rezoned, however, from agricultural to classifications permitting commercial development, multi-family housing development, and planned development. Commercial activity extended along both sides of Alameda Avenue north of the subject property. Property to the east, south, and west of the subject property were, in 1970, residential *291 or vacant. The property's proximity to commercial sites and traffic flow was favorable to its absorption as commercial or high density residential use. Two regional shopping centers served the area, the Westland center on West Colfax Avenue west of Kipling Street, about 2 miles northwest of the Estate and the Villa Italia center, which occupies the southeast corner of the intersection of Wadsworth Boulevard and West Alameda Avenue, about one block north of the property. Villa Italia opened in about 1966 and was one of the most important economic influences in the area, occupying approximately 72 acres and 988,000 square feet of buildings. There are approximately 115 stores and offices in the center. In addition a six-story office building for the Government Employees Insurance Company was under construction on the northeast corner of Wadsworth and Alameda in 1970. On May 1, 1970, petitioner made a charitable contribution of the Belmar Estate, including the mansion, some furniture and the 9.995 acres of land, to the Catholic Archdioces of Denver. The Archdiocese's use of the property and mansion was restricted to religious purposes. In the event it was not so used, the buildings *292 were not to be sold but instead razed within 1 year after cessation of such use and the land was to be devoted to other reasonable uses consistent with the development of the surrounding area. Petitioner apportioned the contribution for income tax purposes as follows: mansion, $2,256,800; land and access road, $2,177,800 (in controversy here); landscaping $254,874; furnishings $113,855. It soon became apparent to the Archdiocese that it could not adequately use the mansion for religious purposes. At the same time, it was costing the Archdiocess over $1,000 a month for upkeep and the lake which had been providing some of the water to irrigate the property was being drained. Within a year after the Archdiocese's acquisition, it considered selling the property. The Archdiocess consulted with various persons associated with the church, including Charles Debelle, a vice president of the Colorado National Bank who worked extensively with real estate loans, and Blair Kittleson, a real estate broker who had been the Archdiocess's primary consultant in real estate matters for over 20 years. No formal appraisal of the Estate was ever made, however, by anyone associated with the Archdiocess *293 nor did the Archdiocess hire an outside appraiser to value the property. This practice was typical for the Archdiocess since it did not wish to pay the added expense of hiring outside appraisers and believed its consultants and staff could provide an adequate appraisal. The Archdiocese also did not hire a real estate company to list the property on the open market in order to avoid paying listing fees. This, too, however, was normal practice for the Archdiocess with respect to how it sold property. The Archdiocese did pay a commission to a realtor on the sale of the property for finding a buyer. On February 20, 1971, an offer to purchase the property was tendered by the Loup Miller Construction Company. This offer was rejected by the Archdiocese. Lake Craddock Development Company submitted a bid for $250,000 but this offer was also rejected by the Archdiocese under the advice of Martin Work, the director of administration and planning, who had the ultimate responsibility for approving sales and purchases of property. It was his belief, after talking to Debelle, Kittleson, and others, that the property was worth more than the $250,000 offer if the property was rezoned. Debelle *294 did not believe there would be any problem rezoning the property. The Archdiocese made a counter-offer of $350,000, subject to rezoning, which Craddock accepted on April 1, 1971. Craddock Development Company is engaged in developing shopping centers, office buildings, and warehouses and industrial buildings. Normally, Craddock would purchase vacant property and construct buildings which it would then lease. Craddock had purchased other property in the Denver metropolitan area and within 2-6 miles of the Belmar Estate. Before purchasing the Estate, Craddock's president considered the use to which he felt he could develop the property. Craddock anticipated that rezoning might be difficult to achieve because the land was in the middle of a larger piece of agricultural land and there might be pressure to prevent it from being used for office buildings. It was his belief that the best chance to obtain rezoning was to develop an office park, building on only 20 percent of the site rather than on the normal 35 percent. After the contract was signed, there was, in fact, a move by some citizens in Lakewood to have the entire Belmar property made into a park and a suit was filed *295 to prevent rezoning. Rezoning to PD (planned development) was accomplished, [2] however, and eventually, an office complex with four buildings was constructed on the Estate. Craddock realized a profit of approximately $20,000 when it tore down the mansion through the sale of salvage. On May 15, 1969, petitioner optioned 110 acres of the 138 acre Belmar property to Hallcraft Homes. The agreement contemplated rezoning to a planned unit development. The purchase price was $6,000 per acre for single-family zoned land and $13,000 per acre for multi-family zoned land, with automatic increases of 7-1/2 percent per year. Approximately 81 acres of this land was purchased by July 20, 1972 and developed into single-family and multi-family townhouses. An additional 10 acres were purchased in 1971 at $14,500 per acre and approximately 13 acres were purchased in June 1972 at $15,000 per acre. R. J. Bayless valued the Estate for the Internal Revenue Service as of May 1, 1970 at $70,000. It was his opinion after considering access to the property, the *296 surrounding uses, and neighborhood trend, that the highest and best use of the property in 1970 was for residential or low-density multi-family. He then used a market comparison approach to value the land. In making his analysis, Bayless compared sales made between 1965 and 1969 of 12 parcels of land generally located within 1-1/2 miles of the property and ranging in size between 4 and 86 acres. Most of these properties were purchased for single-family development. Daniel Clinger valued the 138 acre tract of the Belmar property for the City of Lakewood as of July 20, 1972. At that time, the property was still zoned A-1 but was subject to legal action for rezoning. Clinger believed that numerous buyers would be willing to buy the property with the understanding that there would be extended legal problems before the property could be placed in its highest and best use. He determined that the highest and best use of the 138 acre tract was a combination of commercial, office, high density multi-family, and single-family residences. Clinger used the market comparison approach to value the property. [3] The Wadsworth frontage of 40 acres was valued at $35,000 per acre as either a quasi-commercial *297 office area or as high-density multi-family units; the Lake area of 8 acres was valued as similar to single-family land at $7,500 per acre; the remaining 90 acres was divided up into 45 acres for multi-family uses at $15,000 per acre and 45 acres for single-family purposes at $7,500 per acre. Edward Earley appraised for the City of Lakewood as of March 1, 1972, 208.5 acres of land near or adjacent to the Belmar Estate, fronting on both South Wadsworth Boulevard and the southern boundary of West Alameda Avenue. Earley believed that rezoning to various higher uses would be accomplished there in accordance with a development plan for the property as it had in neighboring areas. The land was valued using the market comparison approach as follows: multi-unit development at $22,500 per acre; headquarters office park at $40,000 per acre; municipal center at $40,000 per acre; combined commercial and office park at $50,000 per acre; school tract, open park and greenbelt area, and lake at $7,500 per acre. On February 11, 1971, the Cartwright Appraisal Company (hereafter *298 Cartwright) valued the land as of May 1, 1970 at the request of petitioner. Cartwright determined that the property had several uses which reflected its highest and best use, including office buildings, a medical center, retail specialty shops, a free standing discount store, and a planned development of office buildings and apartments. The firm believed that rezoning was feasible. Cartwright used the market comparison approach to value the property, comparing it to sales of property in other counties which already had existing improvements, such as a 15 acre office development, a Ramada Inn, a Safeway, and a Skaggs Drugstore. [4] Moreover, it appears that these comparison properties are located within already highly developed areas. The total value of the land was determined to be $2,177,800. The Estate was also appraised by W. F. Honchell, revenue agent for the Internal Revenue Service using the market comparison approach. He concluded that although there would be difficulties in obtaining rezoning *299 for the property, in light of the property's favorable site characteristics and a trend towards commercial zoning in the area, a developer might be willing to pay more for the property than the legal existing use would justify. Comparison was made, therefore, to A-1 and PD zoned property sales. It was Honchell's opinion that Craddock's purchase at $35,000 per acre was the upper limit of the property's value as of June 1972. He then made allowances for the increase in market value from May 1970 and determined that the value as of May 1970 was $25,000 per acre. OPINION If a taxpayer makes a contribution to a properly qualified charitable organization in property other than money, the amount of the deduction is the fair market value of the property at the time of the contribution (reduced as provided in section 170(e)(1)), section 1.170A-1(c)(1), Income Tax Regs. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Section 1.170A-1(c)(2), Income Tax Regs.
Our only task here is to determine the fair market *300 value of the land as of May 1, 1970, the time it was contributed by petitioner to the Archdiocese. Respondent relies on the appraisal made by Bayless who determined the value to be $70,000. Alternatively, respondent maintains that the $350,000 sales price to Craddock is the upper limit of the fair market value of the property. Petitioner relies on the appraisal of $2,177,800 made by Cartwright Appraisal Company to determine the property's value and contends that the sale of the property to Craddock did not reflect its fair market value. We discount the value of the appraisal made by Bayless. His market comparisons were based upon an assumption that the highest and best use of the property was for residential or low density multi-family housing. We disagree with this analysis. The property was zoned agricultural and was surrounded by 200 acres of vacant land. Although there is no question that the land was desirable for residential development, this did not represent its highest use. The area in which the property was located was a rapidly expanding part of the Denver metropolitan area. The neighborhood was two-thirds to three-fourths developed in 1970 and the trend in the *301 area was toward further growth. Nearby property had been rezoned from agricultural to classifications permitting commercial development, multi-family housing, or planned developments. The property's proximity to commercial sites, excellent highway access [5] and traffic flow was favorable to its absorption as commercial or high-density residential use. The appraisals prepared by Clinger, Earley, Cartwright and Honchell all concluded that, despite potential difficulties in obtaining rezoning, the highest and best use of the property was either planned development or commercial. Their appraisals are supported by Craddock, who purchased the land, subject to rezoning, in order to construct offices (although it was Craddock's opinion that the land could not be developed as extensively as other nearby properties). Rezoning was, in fact, accomplished to meet Craddock's plans for development. We hold that a purchaser would have been willing to purchase the property based upon the reasonable likelihood of rezoning and its development to higher uses. [6]
*302 We believe that the most persuasive evidence of the value of the land is the price at which it was sold the following year. Petitioner attempts to discount the probative weight of the sale on the grounds that the Archdiocese was forced to sell the property because of economic pressures and because the property was not appraised by the Archdiocese nor freely exposed nor publicized for competitive purchase. Cf. Kaplan v. Commissioner,43 T.C. 663 (1965). We agree with petitioner that if the Archdiocese was under a compulsion to sell because of economic necessity, the sales price would not reflect its fair market value. Section 1.170A-1(c)(2), Income Tax Regs. Specifically, petitioner contends that the Archdiocese was forced to sell the property because: (1) no suitable religious purpose could be found for the Belmar Mansion; (2) the surrounding property was being developed, resulting in the drainage of the nearby reservoir, the estate's major source of water; (3) the Archdiocese's request for a tax exemption was denied; (4) the building was in need of extensive repair; and (5) high monthly maintenance costs (about $1,000) were required. Initially, we find it *303 hard to believe that, even assuming the Archdiocse had to sell the property, it would do so at a price $1,750,000 less than its value. This is especially so because holding the land would only increase its value due to inflation and decreasing availability of vacant land in the area. Although the Archdiocese felt that it was not worth the $1,000 monthly maintenance costs to it in light of its inability to use the mansion for the requisite religious purposes it was not hard-pressed for cash nor unable to make the payments. Rather, it preferred to use the money for other religious purposes. This falls far short of an "economic necessity." There is simply not the appearance of a forced sale; the evidence shows only that the Archdiocese, for the reasons petitioner states, wanted to sell the property. Nor do we believe the Archdiocese was unacknowledged of the Estate's true value. The Archdiocese consulted with various church members who were knowledgeable in real estate and rejected offers from both the Loup Miller Construction Company and Craddock's first bid of $250,000. Although the Archdiocese did not hire an outside appraiser nor a real estate company to sell the property, *304 this was typical of its usual practice in selling property. In light of the foregoing, we do not believe Cartwright's appraisal is probative of the value of the property. Moreover, we have serious doubts about the validity of its comparisons. The properties to which Cartwright compared the subject property were in other counties, already improved, and were apparently in areas already fully developed; the other appraisals were far less than Cartwright's and generally support Craddock's purchase price. Based on this record we find that the value of the property as of April 1, 1971 to be $350,000. We must, of course, value the property as of May 1, 1970, the date of the contribution. In order to account for the general increase in value in real estate in the area, we believe that the property appreciated 7-1/2 percent from May 1970 through April 1971 based upon the 7-1-2 percent factor petitioner used in the Hallcraft Homes option. This results in a value of the land as of May 1, 1970 of $325,582. Accordingly, we hold that the amount of charitable contribution is $325,582. Decision will be entered under Rule 155.
Footnotes
1. A general agricultural category permitting any use permitted in the "R-1" or "Residential-1" district--general farming and stock raising, greenhouses, nurseries, and other related uses.↩
2. Zoning property as PD provides controls on established development plans which provided for groupings of buildings and complexes.↩
3. Among other sales, Clinger used both the Craddock purchase and the Hallcraft option in his valuation as comparisons.↩
4. Because the land was already improved, for at least one of the properties, Cartwright had to determine the value of the office space before arriving at the value of the land.↩
5. Respondent contends that access was poor because it was difficult to turn onto the property when going north on Wadsworth Boulevard. This difficulty was removed when a traffic light was put on Wadsworth Boulevard, and all of the appraisers considered the access to be excellent. ↩
6. As another example of this, petitioner optioned 110 acres of the Belmar property, subject to rezoning, to Hallcraft Homes for $13,000 per acre for multi-family zoned land with automatic increases of 7-1/2 percent per year.↩